IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANDREW KING,<br><br>    Plaintiff,<br><br>  v.<br><br>CITY AND COUNTY OF SAN FRANCISCO, PUBLIC UTILITIES COMMISSION, SAN FRANCISCO WATER DEPARTMENT, and DOES 1–25,<br><br>    Defendants.<br>                                                        / | No. C 11-01857 WHA<br><br>**ORDER GRANTING MOTION FOR SUMMARY JUDGMENT** |

### INTRODUCTION

In this employment discrimination action, defendants move for summary judgment on all claims. For the reasons stated below, the motion is **GRANTED**.

### STATEMENT

Plaintiff Andrew King is a retired, African American plumber. From 1996 to 2010, King worked for defendants City and County of San Francisco, the San Francisco Public Utilities Commssion, and the San Francisco Water Department. King was hired as an apprentice plumber in 1996 and retired as a utility plumber in March 2010. King alleges that he was subjected to harassment and discrimination while working for defendants because of his race and physical disability.

**1. APPRENTICE PLUMBER WITH SERVICE DEPARTMENT.**

Defendants' plumbers were assigned to work in either the "Service Department" or the "Main Gang" during the applicable time period (Teahan Decl. ¶ 3; King Dep. at 60). Service Department plumbers were responsible for water services from a water main into a private property, while Main Gang plumbers were responsible for water mains or water services pipes of four inches or larger located within the city (Teahan Decl. ¶ 3). Generally, plumbers in the Main Gang had more experience and skill. It was considered more prestigious to work in the Main Gang. And working in the Main Gang also afforded greater opportunity for overtime pay (Teahan Decl. ¶ 4, King Dep. at 76–77, 80–84; King Decl. ¶¶ 23–24).

In 1996, King was hired as an apprentice plumber and assigned to the Service Department, not the Main Gang (King Dep. at 80; Teahan Decl. ¶¶ 2, 4). King alleges that less-experienced white plumbers were promoted to Main Gang before him. Also, while working in the Service Department, King was involved in a racial incident where a co-worker left a noose on the seat of a truck that King was scheduled to ride in.[1]

**2. PROMOTION TO UTILITY PLUMBER AND MAIN GANG.**

In October 2004, King was promoted to utility plumber (Teahan Decl.¶ 7; King Dep. at 150). Sometime in 2005 or 2006, King was promoted to the Main Gang (Teahan Decl. ¶ 8; King Dep. at 87, 98, 150). The timing of his promotion to Main Gang will be important for purposes of statute of limitations, discussed later.

Shortly after King was promoted into the Main Gang, a friendly co-worker used the "n-word" in King's presence but not to refer to King. Although King did not believe that his co-worker intended to use this word offensively, he was nevertheless upset by the incident (King Dep. at 122–23).

**3. MEDICAL LEAVE AND ACCOMMODATION REQUESTS.**

From August 2007 to February 2009, King was on medical leave due to a foot injury that occurred outside work; and back, hip, and elbow pain (King Dep. at 124, 128). While on his

---

[1] King's opposition brief relies entirely on his own declarations for evidentiary support. Defendants' evidentiary objections are addressed as they become relevant to the summary judgment analysis.

2

1  leave of absence, King made inquiries into disability accommodations. In April 2008, King
2  called defendants' human resource department and stated that he could not continue his duties
3  (Regler Decl. ¶ 3). In response, defendants mailed to King the forms necessary for requesting a
4  disability accommodation. Shortly thereafter, King submitted a request for reasonable
5  accommodation and authorized defendants to contact his primary care doctor, Dr. Daniel Null,
6  and foot surgeon, Dr. Keith Donatto (Regler Decl. ¶ 4).

In August 2008, Dr. Null indicated that King could not perform the essential functions of his position (utility plumber) due to significant lower back pain and elbow pain aggravated by repetitive motion and heavy lifting (Regler Decl. Exh. A). Later that month, human resources wrote to King requesting a copy of his resume to see if he was qualified for any other positions (Regler Decl. ¶ 6). Human resources did not receive a response. Defendants wrote to King again the next month, reminding him to submit his resume so that a job search could be performed (Regler Decl ¶ 6). Although it is unclear when he did so, King avers that he did "forward a copy of [his] resume as requested" (King Decl. ¶ 45).

A few months later in January 2009, King's physician, Dr. Null, told defendants that King's medical condition had improved and that he could return to work with some restrictions (Regler Decl. ¶ 7). Specifically, Dr. Null opined that King could return to work as a utility plumber, provided that he did not spend more than 5.4 hours (instead of the regular 7.2 hours) digging with a shovel or installing pipes, and did not spend more than four hours walking, standing, bending, squatting, kneeling, or twisting per day (Regler Decl. Exh. B). Based on Dr. Null's assessment, defendants allowed King to return to work with these restrictions as a reasonable disability accommodation (Regler Decl. at ¶ 9, Exh. C).

### 4. RETURN TO WORK.

King returned to work as a utility plumber in February 2009, where he was assigned work that was consistent with his doctor's restrictions: he did not spend more than 5.4 hours per day digging with a shovel or installing pipes, and did not spend more than four hours per day walking, bending, squatting, kneeling, or twisting (Tehran ¶¶ 10–11). King, however, was not satisfied with his assigned modified duty and believed that he should have instead been

accommodated by being placed in a "leak location" or "pipe location" truck, where the plumbers did not do as much heavy lifting or jackhammering. King did not tell anyone that he wanted to work on the "leak location" or "pipe location" truck as an accommodation (King Dep. at 100–01, 108–10).[2]

In April 2009, King told defendants' human resource department that he was feeling pain while working. Defendants told King to file a new or modified request for accommodation and sent King the necessary medical authorization forms a week later (Regler Decl. ¶ 10). Around that same time, King requested to be considered for an open claims investigator or senior claims investigator position as a potential accommodation for his disability (Regler Decl. ¶ 11). A few weeks later, defendants' human resource department told King that he was not qualified for either position because he did not meet the minimum training and experience qualifications (Regler Decl. at ¶ 12). Human resources again requested that King provide new medical authorizations or records to allow an evaluation of different accommodations (Regler Decl. Exh. D).

King did not contact human resources again until February 2010 when he submitted a new doctor's note (Regler Decl. ¶ 13). In the new note, Dr. Null opined that King could neither use a jackhammer, an essential job function; nor stand more than 30 minutes per hour; nor bend, squat, climb, kneel, or twist more than 15 minutes per half hour (Regler Decl. Exh. G). Around the same time, King applied for a water service inspector position as an accommodation for his disability. A couple of days later, defendants notified King that he would need to take a leave of absence pending a response to his new accommodation request (Regler Decl. at ¶ 17). King left work in February 2010 (King Decl. ¶ 34).

---

[2] King seems to have changed his story since his deposition. In his declaration submitted with his opposition brief, King avers that he "did request to work on the pipe location truck" (King Decl. ¶ 55). This is wholly inconsistent with his deposition testimony that he did not ask his supervisor to be placed on the pipe location truck (King Dep. at 100–01, 108–10). Although not necessary for granting defendants' motion for summary judgment, this order nonetheless finds that King's later declaration was an attempt to create a sham issue of fact. *Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 267 (9th Cir. 1991). King's later declaration is purposely vague on details, such as when he asked and how his supervisor responded. His supervisor avers that King never made such a request (Teahan ¶ 14).

4

1  In March 2010, defendants notified King that based on his representations and his
2  doctor's restrictions, they agreed that he was not able to perform the duties of a utility plumber.
3  They also notified King that he was being referred for a 60-day citywide job search for a new
4  municipal position (Regler Decl. Exh. H).

### 5. RETIREMENT.

Unbeknownst to defendants' human resource department, King applied for disability retirement on March 20, 2010, with the municipal Employees' Retirement System (Regler Decl. Exh. I; King Dep. at 26–27). King's retirement application was eventually granted (Regler Decl. at ¶ 19). In April 2010, defendants' human resource department spoke with King and confirmed that he was no longer interested in pursuing his reasonable accommodation request, as he had decided to retire instead (Regler Decl. Exh. J).

### 6. REPORTING OF DISCRIMINATION.

King avers that he sought and obtained counseling from the municipal Employee Assistance Program between August 2007 and December 2011, during which time he "complained of [his] anger and elevated stress level related to unfair managerial practices, racial discrimination, and ongoing harassment, including the continual exacerbation of residual daily stressors [he] had been experiencing due to remaining strong feelings and disappointments about unfair practices at his place of employment" (King Decl. ¶ 18). These EAP counseling sessions were confidential and not reported to his work department, the Water Department or its human resource department (Gschwind Reply Decl. Exh. A).[3]

King also spoke about defendants' discriminatory practices with his African American co-workers, but he never put anything in writing and "would never consider making a formal complaint" (King Dep. at 56–57; King Decl. ¶ 34). Perhaps inconsistently, at another point in his declaration, King avers that he did complain about racial discrimination and ongoing harassment to "Kevin Berry, Manager, in 2009 and Bill Teahan [,another supervisor,] on the last day of his employment in February, 2010" (King Decl. ¶ 34).

---

[3] This information was only provided in a reply declaration, which is generally disfavored, and will not be used in the analysis.

5

### 7. FILING DISCRIMINATION COMPLAINT.

King filed a charge of discrimination with the federal Equal Employment Opportunity Commission on November 18, 2010 (Regler Decl. Exh. K). The EEOC granted King the right to sue in court without adjudicating the merits of his discrimination claim. King filed this instant action in April 2011, alleging that has been "subjected to continuing harassment, ridicule and humiliation without cause or justification. . . . [because of his] race and color, physical disability, and in retaliation against me because of my protests of such unlawful actions" (King Decl. ¶¶ 19, 20). King claims unlawful discrimination, harassment, and retaliation under California's FEHA and 42 U.S.C. 1981.

## ANALYSIS

Summary judgment is proper when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FRCP 56(c). An issue is genuine only if there is sufficient evidence for a reasonable fact-finder to find for the non-moving party, and material only if the fact may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986).

### 1. STATUTE OF LIMITATIONS BARS CLAIMS BASED ON DISCRIMINATORY ACTS BEFORE NOVEMBER 2006.

The parties agree that claims for race discrimination under California Government Code Section 12940(a) are subject to a one-year statute of limitations, and claims under 42 U.S.C. 1981 are subject to a four-year statute of limitations. CAL. GOV'T CODE § 12960(d); *see Johnson v. Lucent Technologies Inc.*, 653 F.3d 1000, 1005–08 (9th Cir. 2011). Plaintiff filed his charge of discrimination with the EEOC on November 18, 2010. Therefore, only conduct occurring after November 18, 2009, is actionable under state law, and only conduct occurring after November 18, 2006, is actionable under Section 1981.

"A discriminatory practice, though it may extend over time and involve a series of related acts, remains divisible into a set of discrete acts, legal action on the basis of each of which must be brought within the statutory limitations period." *Cherosky v. Henderson*, 330 F.3d 1243,

6

1247 (9th Cir. 2003). Discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges. *Id.* at 1246.

In this instant action, any alleged claim for failure to promote to Main Gang is time-barred. King was assigned to the Main Gang in "late 2005 or early-to-mid 2006" — prior to the start of Section 1981's four-year statute of limitations period on November 18, 2006 (Teahan Decl. ¶ 8). Although not entirely clear from his declaration, King appears to agree with Teahan's declaration that he was assigned to the Main Gang in "late 2005 to early to mid 2006" (King Decl. 31–32):

> 31. At paragraph 8 of Teahan's declaration, Teahan states, among other things, that I was assigned to the Main Gang in accordance with my wishes in late 2005 or early to mid 2006.
>
> 32. My assignment to the main gang in 2006 confirms that I spent my first ten (10) years with the Water Department in the Service Department.

King's declaration statement is consistent with his deposition testimony, where he stated that he was transferred sometime in 2005 or 2006 (King Dep. at 87, 98, 150).

Defendants made this statute-of-limitations argument in their motion brief, arguing that any claim for failure to promote to the Main Gang was time-barred (Br. 13). In response, King's opposition brief did not dispute that he was transferred to the Main Gang before November 2006, and in fact, agreed that incidents prior to his promotion to Main Gang are time-barred (*see* Opp. 16) (emphasis added):

> In its contention that King's racial discrimination and harassment claims pursuant to 42 U.S.C. Section 1981 and the Fair Employment and Housing Act are time barred, Defendant mistakenly relies upon *incidents which are not the subject of said causes of action* but simply provide an evidentiary history of discriminatory animus.

King's statement in his court brief is a binding judicial admission that his Section 1981 claim is not based on defendants' alleged failure to timely promote to the Main Gang. *See Trinidad y Garcia v. Thomas*, 683 F.3d 952, 982 (9th Cir. 2012) (en banc). Therefore, based on the entire

7

record, this order finds that there is no genuine dispute that King was promoted to the Main Gang before November 18, 2006.[4]

### 2. NO ADVERSE EMPLOYMENT ACTION AFTER HE WAS PROMOTED TO MAIN GANG.

To prove he suffered an adverse employment action, a plaintiff must present evidence that the employer's action materially affected the terms, conditions, or privileges of his employment. *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1089 (9th Cir. 2008); *Yanowitz v. L'Oreal USA Inc*, 36 Cal. 4th 1028, 1050–51 (2005). "Not every employment decision amounts to an adverse employment action. For example, mere ostracism in the workplace is not enough to show an adverse employment decision." *Strother v. Southern California Permanente Medical Group*, 79 F.3d 859, 869 (9th Cir. 1996). Similarly, "a mere offensive utterance or even a pattern of social slights by either the employer or co-employees cannot properly be viewed as materially affecting the terms, conditions, or privileges of employment . . ." *Yanowitz*, 36 Cal. 4th at 1054.

King did not suffer an adverse employment action after November 2006. He was not fired, and he was not denied a promotion. Instead, King voluntarily retired in 2006. There is insufficient evidence to show that King's retirement was somehow forced upon him by defendants because of his race. King did not cite to any racially discriminatory actions by defendants that forced him to retire.

King seems to allege that not being designated as a "lead" plumber on various jobs while he was a utility plumber on Main Gang were adverse employment actions. The undisputed facts are that this designation of "lead" plumber was not a promotion. Instead, it was a designation given to the team leader whenever there were two or more utility plumbers on one project (Tehran ¶ 16). This transitory title did not come with an increase in pay or other tangible employment benefits (*see* King Dep. at 146). There is no indication that being designated a "lead" plumber would later result in promotion or other employment benefits. While being a

---

[4] The doctrine of continuing violations does not apply here. King does not argue that time-barred events, such as a failure to promote to the Main Gang, gave rise to discriminatory acts that occurred during the limitations period. *See The Committee Concerning Community Improvement v. City of Modesto*, 583 F.3d 690, 701 (9th Cir. 2009).

8

"lead" plumber on a job might have given leadership experience, defendants' alleged failure to provide this type of amorphous benefit does not rise to the level of materially affecting the terms, conditions, or privileges of employment required for claims under FEHA and Section 1981, at least on the present record.

King also seems to allege that he was denied reasonable accommodations for his disability because of his race. As discussed later, defendants provided King with reasonable accommodations for his disability.

### 3. HOSTILE WORK ENVIRONMENT.

To prevail on a hostile workplace claim, a plaintiff must show: (1) that he was subjected to verbal or physical conduct of a protected characteristic; (2) that the conduct was unwelcome; and (3) that the conduct was sufficiently severe or pervasive to alter the conditions of the plaintiff's employment and create an abusive work environment. *Vasquez v. County of Los Angeles*, 349 F.3d 634, 642 (9th Cir. 2003); *see Metoyer v. Chassman*, 504 F.3d 919, 941–42 (9th Cir. 2007) (FEHA and Section 1981 have parallel standards).

> Whether the workplace is objectively hostile must be determined from the perspective of a reasonable person with the same fundamental characteristics as the plaintiff. Although the "mere utterance of an ... epithet which engenders offensive feelings in an employee" does not alter the employee's terms and conditions of employment sufficiently to create a hostile work environment, "when the workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' " such an environment exists. Neither "simple teasing," "offhand comments," nor "isolated incidents" alone constitute a hostile work environment.

*Lee v. Eden Medical Center*, 690 F. Supp. 2d 1011, 1025 (N.D. Cal. 2010) (Wilken, C.J.) (citations to controlling precedent omitted). A claim of hostile environment requires at least one harassing act to have occurred during the limitations period. *Cherosky v. Henderson*, 330 F.3d 1243, 1246 (9th Cir. 2003).

The present record is insufficient to support a claim for harassment. There are two specific instances of unwelcome conduct regarding protected characteristic in the record: (1) sometime in the late 1990s or early 2000s, while King was still an apprentice plumber, a co-worker put a noose in the seat of a truck King was scheduled to ride in, and (2) sometime around

9

late 2005 to early-to-mid 2006, when he first got into the Main Gang and was being trained, King heard a friendly co-worker use the word "n-word" (King Dep. at 117–19; 123).

As an initial matter, this order finds that these alleged incidents are time-barred for reasons already discussed. The applicable limitations period under Section 1981 is on or after November 2006. There is no genuine dispute that both incidents identified by King occurred before November 2006. Because King has not identified any offensive conduct regarding a protected characteristic that occurred within the limitations period, his claim of hostile work environment fails.

In an abundances of caution, even assuming that the "n-word" incident — which occurred when King "first got into the Main Gang" during training (King Dep. at 123) — was not time-barred under Section 1981, the two incidents of offensive conduct were not sufficiently severe or pervasive to alter the conditions of the plaintiff's employment and create an abusive work environment. A claim of hostile environment requires consideration of all events constituting the claim even if some occurred before limitations period. *See Cherosky v. Henderson*, 330 F.3d 1243, 1246 (9th Cir. 2003). Again, in the record, King identified two incidents of offensive conduct. The first is an instance where a friendly co-worker used the "n-word" in King's presence, but not directed at King. According to King's own recollection, the co-worker did not direct his use of the "n-word" at anyone and did not use the word to hurt anyone's feelings. Reproduced below is King's account of the event (King Dep. at 122–23):

> King: This guy, Juan Cisneros — this guy who I really liked — Latin — Mexican guy — had used the N-word. Juan did not mean it to — when he said it, he did not mean it to, like, hurt me. He pretty much said, "Oh, Andrew has heard this word, and they say this all the time."
>
> But Frank Jordan said, "Hey, that's not good. Don't use that word around me. That's a word" — he stood up and said, "That's a word that my father and my mother wouldn't even allow us to use."
>
> And although Juan might have thought it didn't hurt —

The only other incident — which occurred sometime in the late 1990s or early 2000s — involved a noose. Reproduced below is King's account of the incident where a noose was left in a truck seat that he was suppose to sit in (King Dep. at 117–19):

10

> King: I get ready to walk into the truck. Dan [, a co-worker,] steps down off the truck. I step into the truck. Before I step in, there's a noose right on the seat. I look and I see a small noose, but I'm already saying, "Oh, this couldn't be."
>
> \*      \*      \*
>
> King: Roger McMillan [, another co-worker,] was sitting in the driver's seat. Dan Watson gets off the truck. And I know Dan had some racism in him also. Dan gets off the truck. When he moves, I see the noose. It's on the seat. I look at it, and he takes it. I don't recall if its was Roger that took the noose.
>
> I'm not quite sure who actually ended up snatching it when I started looking at it, but when I started looking at it, "boom" he goes, "This is mine."
>
> \*      \*      \*
>
> King: So things like that. I'm getting on the truck. He's getting off the truck. It's on my seat. "Oh," and then you take it with you?
>
> And I'm looking at it, and I'm like trying to figure: Is this used for a pulley?
>
> I'm trying to give it a reason why it's here.
>
> [I say to myself:] "No, Andrew. You are in denial. It is a noose, okay?"

King did not report this incident (King Dep. at 120). These two offensive incidents, the noose and the n-word, were separated in time by as much as nine years. As a matter of law, these two events do not rise to the level of severity and pervasiveness required to find a hostile work environment for purposes of Section 1981.

The severity and pervasiveness of inappropriate conduct required to show an abusive work environment for purposes of Section 1981 is high. For example, our court of appeals has held that "no reasonable jury could have found a hostile work environment despite allegations that the employer posted a racially offensive cartoon, made racially offensive slurs, targeted Latinos when enforcing rules, provided unsafe vehicles to Latinos, did not provide adequate police backup to Latino officers, and kept illegal personnel files on plaintiffs because they were Latino." *Vasquez v. County of Los Angeles*, 349 F.3d 634, 643 (9th Cir. 2003). In *Kortan v. California Youth Authority*, our court of appeals held that there was no hostile work environment

11

as matter of law even though a supervisor called female employees "castrating bitches," "Madonnas," or "Regina" on several occasions in plaintiff's presence; the supervisor called the plaintiff "Medea"; the plaintiff complained about other difficulties with that supervisor; and the plaintiff received letters at home from the supervisor. 217 F.3d 1104, 1104–07. Our court of appeals has held that such conduct was not severe or pervasive enough to unreasonably interfere with the plaintiff's employment as a matter of law.

So too here. Of course, both events are disgusting and should not be tolerated but these events were separated in time by as much as nine years and did not rise to the level of severity and pervasiveness required to find a hostile work environment for purposes of Section 1981 as a matter of law.

### 4. DISABILITY DISCRIMINATION.

#### A. Reasonable Accommodations.

California Government Code Section 12940(m) makes it unlawful for an employer "to fail to make reasonable accommodation for the known physical or mental disability of an applicant or employee," except where it would cause an undue hardship. It is also unlawful for an employer "to fail to engage in a timely, good faith, interactive process with the employee or applicant to determine effective reasonable accommodations, if any, in response to a request for reasonable accommodation by an employee or applicant with a known physical or mental disability or known medical condition." CAL. GOV'T CODE § 12940(n).

In this instant action, there is insufficient evidence that defendants failed to provide reasonable accommodations for King's disability and injuries. The record shows that defendants provided King with reasonable accommodation in early 2009 in accordance with King's physician's restrictions: no more than 5.4 hours per day digging with a shovel or installing pipes, and no more than four hours per day of walking, bending, squatting, kneeling, or twisting (Tehran ¶¶ 10–11).

Subsequently, when King complained of pain despite being on modified work assignments, the human resource department asked King to authorize a consultation with King's physician. Several months later, shortly after a new physician's assessment was finally

submitted, defendants determined that King could no longer work as a utility plumber. For the sake of his own health, King was put on a temporary leave of absence while defendants conducted a 60-day citywide search for an alternative job to accommodate King's disability. In particular, defendants looked into a Water Service Inspector position; that position, however, was eliminated due to budget cuts (Regler Decl. at ¶¶ 17–18). Before the job search was completed, King voluntarily applied for disability retirement, which was granted. Given these facts, defendants did not fail to engage in the interactive process with King to find reasonable accommodation.

In conclusory fashion, King states in his declaration that defendants refused to comply with his doctor's work restrictions in 2009. But these are conclusory arguments insufficiently detailed to raise a genuine dispute of material fact. King's declaration only offers statements such as: "As a matter of fact, I was never accommodated according to the restrictions set forth by my physician. . . . Because of the refusal to recognize work limitations set forth by my physician, Dr. Null, as I continued to work, I suffered injuries . . ." (King Decl. ¶¶ 36–37). No where in the record has King explained why his assignment for modified duties did not meet the restrictions set forth by his physician. King's summary conclusions are insufficient to raise a genuine dispute of material fact.

King argues that he should have been accommodated by being placed in a "leak location" or "pipe location" truck, where the plumbers did not do as much heavy lifting or jackhammering. This argument is unpersuasive. Defendants made a reasonable accommodation for King by following his physician's restrictions. Defendants were not required to grant King's preferred accommodation, only a reasonable one. *United States E.E.O.C. v. UPS Supply Chain Solutions*, 620 F.3d 1103, 1111 (9th Cir. 2010); *Hanson v. Lucky Stores, Inc.*, 74 Cal. App. 4th 215, 228 (1999).[5]

---

[5] At one point in his deposition, King *briefly* stated that he was not put on the pipe location truck because of his race (King Dep. at 110). King did not identify this as a basis for a racial discrimination claim. In an abundance of caution, assuming that this is another claim for racial discrimination, it too would fail. Under the *McDonnell Douglas* burden-shifting framework, defendants have rebutted the presumption of discrimination with evidence that there were no vacancies on the pipe-location truck, and moreover, King was not qualified to work on the truck (Teahan ¶¶ 13–15). King, in turn, has failed to cite facts showing that he was not put on the

13

### B. Discrimination.

It is unlawful to discharge a person from employment or discriminate against the person in the terms, conditions, or privileges of employment, because of physical or mental disability or medical condition. CAL. GOV'T CODE § 12940(a). To prove he suffered an adverse employment action, plaintiff must present evidence that the action materially affected the terms, conditions, or privileges of his employment. *Yanowitz v. L'Oreal USA Inc*, 36 Cal. 4th 1028, 1050–51 (2005).

As discussed previously, King did not suffer an adverse employment action during the limitations period. He voluntarily retired, and there is insufficient evidence that defendants somehow forced him into retirement through discriminatory actions. Defendants engaged in a good faith effort to find reasonable accommodation for King's injuries. Indeed, defendants were in the process of finding new employment for King as reasonable accommodation when King decided to retire voluntarily.

### C. Failure to Prevent.

Because there is insufficient evidence of discrimination or harassment, King's claim for failure to prevent unlawful discrimination in violation of California Government Code Section 12940(k) must fail as well. *Trujillo v. North County Trans. Dist.*, 63 Cal. App. 4th 280, 288–89 (1998).

### 5. RETALIATION.

"Adverse employment action," as required for a retaliation claim, is adverse treatment that is reasonably likely to deter employees from engaging in protected activity. *Ray v. Henderson*, 217 F.3d 1234, 1242–43 (9th Cir. 2000).

King alleges that defendants denied him reasonable accommodation and forced him into disability retirement in retaliation for making complaints. As discussed already, there is insufficient evidence in the record that defendants took any adverse employment action against King within the limitations period. Again, defendants did not deny reasonable accommodation. And defendants did not force King into voluntary retirement. Therefore, King's retaliation claim fails.

---

truck because of his race, and the record is wholly insufficient to support such a claim.

**CONCLUSION**

For the reasons stated, defendants' motion for summary judgment is **GRANTED**. The clerk shall close this case.

**IT IS SO ORDERED.**

Dated: September 6, 2012.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE